28

1

2  Schiff Hardin LLP
   Rocky N. Unruh, Bar No. 84049
3  runruh@schiffhardin.com
   One Market, Spear Street Tower
4  Thirty-Second Floor
   San Francisco, CA  94105
5  Telephone:    (415) 901-8700
   Facsimile:    (415) 901-8701
6

7  Arent Fox LLP
   Michael B. Hazzard (*pro hac vice* application
   to be filed)
8  hazzard.michael@arentfox.com
   1050 Connecticut Avenue, NW
9  Washington, DC 20036-5339
   Telephone:    (202) 857-6000
10 Facsimile:    (202) 857-6395

11 Attorneys for Defendant
   CORE COMMUNICATIONS, INC.
12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16

17 SUSAN SIMON, individual, on behalf of        Case No.  C09-00879 MMC
   herself and all others similarly situated,
18                                               **DECLARATION OF BRET L. MINGO**
                                                 **IN SUPPORT OF DEFENDANT CORE**
19             Plaintiffs,                       **COMMUNICATIONS, INC.'S**
                                                 **MOTION TO DISMISS UNDER FED.**
20 v.                                            **R. CIV. P. 12(b)(2)**

21 ADZILLA, INC. (NEW MEDIA), a
   Delaware Corporation; CONDUCIVE           Date:       July 10, 2009
22 CORPORATION, a Delaware Corporation;      Time:       9:00 a.m.
   CONTINENTAL VISINET                       Courtroom:  7, 19th Floor
23 BROADBAND, INC., a Delaware              Judge:      Hon. Maxine M. Chesney
   Corporation; CORE
24 COMMUNICATIONS, INC., d/b/a/
   CORETEL COMMUNICATIONS, INC., a
25 Delaware Corporation; and DOES 1-50,
   Corporations Defendants,
26

27             Defendants.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF BRET L. MINGO IN SUPPORT OF DEFENDANT CORE
COMMUNICATIONS, INC.'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(2)        CASE NO. C09-00879 MMC

Dockets.Justia.com

I, Bret Lyle Mingo, do hereby declare and state:

1. I am the President of defendant Core Communications, Inc. ("Core"). I have held this position since Core's founding in 1999. In this capacity, I am familiar with all aspects of Core's business operations. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I would be competent to testify to these facts.

2. I have reviewed a copy of the complaint in this matter. The complaint alleges that Core is a Delaware corporation with a d/b/a of "CoreTel Communications, Inc." That is not correct. Core is incorporated in the District of Columbia and has its principal place of business in Annapolis, Maryland. Core does not use any d/b/a. CoreTel Communications, Inc. ("CoreTel") is a holding company that wholly owns Core and various affiliates of Core. I am also President of CoreTel. CoreTel is incorporated in Delaware, and its principal place of business is also in Annapolis.

3. Core operates as a competitive local exchange carrier ("CLEC") in Maryland and Pennsylvania. Core offers telecommunications services and selected Internet routing services to Internet service providers ("ISPs"). ISPs, in turn, provide Internet access to their end user customers, such as the plaintiff in this case. Core does not provide any services directly to end users of ISPs, and the plaintiff in this case is not a customer of Core's.

4. Core does not conduct any of its business in California, and has no customers in California.

5. Core is not authorized to do business in California and does not have a registered agent for service of process in California.

6. Core has no employees who work in California.

7. Core does not advertise in California.

8. Core neither owns nor leases any property in California.

9. Core does not have any office, bank account, mailing address or telephone listing in California.

10. Core does not pay taxes in California.

11. Core has not committed in California (or anywhere else) any of the acts alleged by

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF BRET L. MINGO IN SUPPORT OF DEFENDANT CORE
COMMUNICATIONS, INC.'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(2)          CASE NO. C09-00879 MMC

1     the plaintiff in paragraph 20 of the complaint.

2          12.     To the extent plaintiff seeks to establish personal jurisdiction in California over

3     Core because of its prior business dealings with co-defendant Adzilla, Inc. ("Adzilla") – which

4     plaintiff alleges has its principal place of business in California – there is no basis to plaintiff's

5     position.

6          13.     On August 30, 2006, Core entered into a "Services Agreement" ("Agreement")

7     with Adzilla, a true and correct copy of which is attached hereto as Exhibit A.  In the Agreement,

8     Adzilla is described as a Canadian corporation headquartered in Vancouver, British Columbia.

9     The Agreement was signed by Martin Stewart of Adzilla and faxed to me on August 30, 2006.

10    The fax transmission was initiated from Adzilla's telephone number (604) 628-4351 and was

11    answered by Core's telephone number (410) 216-9867.  Adzilla's exchange, 604-628, is

12    associated with Vancouver, British Columbia. Core's exchange, 410-216, is associated with

13    Annapolis, Maryland.  Adzilla's fax cover sheet lists a street address of 840-1140 West Pender,

14    Vancouver, BC.

15         14.     The Agreement states in section 13.1 that it is to be governed by the laws of the

16    state of New York, without regard to conflict of law principles.

17         15.     The first step under the Agreement was to test the compatibility of Adzilla's

18    equipment and technology with Core's network.  This testing phase began in approximately

19    March of 2007.  During the testing phase, Adzilla's equipment was physically installed on Core's

20    network only at Core's points of presence ("POPs") in Philadelphia, Pennsylvania and Ashburn,

21    Virginia.

22         16.     In December of 2007, Core stopped the testing phase and de-activated all of

23    Adzilla's equipment because of on-going interference with the operation of Core's network.

24    There has been no Adzilla equipment installed and operating on Core's network since that time.

25    During the entire testing phase, Core employees stationed in Pennsylvania communicated with

26    Adzilla employees stationed in Vancouver, British Columbia.  None of the work under the

27    Agreement was performed in California, and to my knowledge and belief, none of Adzilla's

28    employees with whom Core employees communicated were stationed in California.

- 3 -

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF BRET L. MINGO IN SUPPORT OF DEFENDANT CORE
COMMUNICATIONS, INC.'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(2)          CASE NO. C09-00879 MMC

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on May 26 , 2009, at Annapolis, Maryland.

_____
Bret L. Mingo

SF\9349045.1

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF BRET L. MINGO IN SUPPORT OF DEFENDANT CORE
COMMUNICATIONS, INC.'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(2)        CASE NO. C09-00879 MMC

# EXHIBIT A



**FAX**

TO  Bret

FROM  Martin Stewart

COMPANY

CC

FAX  410-2169867

PAGE

SUBJECT  Executed Agreement

August 30, 2006

Here is a copy of the fully executed revenue share agreement for your records.

Please sign two originals, send them to me and we'll sign them and send one back to you.

We are looking forward to kicking off our partnership together.

Sincerely,


Martin Stewart
Regional Account Director - Network Group
Adzilla New Media
604 628 4369

www.adzilla.com   The information in this fax is confidential and may be legally privileged.  It is intended solely for the addressee.  Access to this fax by anyone else is unauthorized.  If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.  When addressed to our clients any opinions or advice contained in this fax are subject to the terms and conditions expressed in the applicable ADZILLA new media client engagement contract.

## SERVICES AGREEMENT

THIS SERVICES AGREEMENT (the "Agreement") dated this **30** day of **April** 2006 (the "Effective Date") is made by and between Core Communications, Inc., a District of Columbia corporation with headquarters at ("Company"), and the undersigned, ADZILLA INC., a Canadian corporation located at 840 - 1140 West Pender Street, Vancouver, BC, V6E 4G1, Canada ("ADZILLA") (each, a "Party," and collectively, the "Parties").

## RECITALS

WHEREAS, ADZILLA provides Internet advertising and value-added services to Internet access service providers.

WHEREAS, Company provides networking and other related services to Internet access service providers and desires to offer ADZILLA's Internet advertising and value-added services to its ISP Customers.

WHEREAS, Company and ADZILLA agree that subject to certain provisions and limitations contained herein, ADZILLA will provide certain Internet advertising technology installed in the Company's Network.

NOW, THEREFORE, for mutual and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, ADZILLA and Company hereby agree as follows:

1. **Certain Definitions**

    1.1.  Accessible End Users means the number of End Users of ISP Customers at a specified POP that are technically enabled to access the ADZILLA Technology and are technically enabled to receive Adzilla Advertising. Since the precise number of each ISP Customer's End Users may not always be attainable, for purposes of this Agreement, this number will calculated by multiplying the average number of Managed Modem ports utilized by ISP Customers at a specified POP that Company reasonably believes are receiving Adzilla Advertising by eight (8) End Users per said Managed Modem port.

    1.2.  Advertising means the promotion of advertisers, sponsors, promotional partners, media buying services or other similar entities that, whether directly or through an agency, promote their brands or their products or services through Content delivered through the ADZILLA Services on Company's Network.

    1.3.  ADZILLA Publisher Network means the centrally managed group of third party web sites through which ADZILLA, or its advertising partner, can distribute advertising.

    1.4.  ADZILLA Services means the Advertising and value added services described in Article 2 of the Agreement.

    1.5.  ADZILLA's Technology means all hardware and software components owned, provided or operated by ADZILLA including, without limitation, all equipment set forth in Schedule A, all documentation, changes, and modifications thereof, and any other technology that is created by ADZILLA, or provided by a third party on behalf of ADZILLA hereunder, and used by ADZILLA to provide the ADZILLA Services.

    1.6.  Company's Network means the entire network, inclusive of both hardware and software components whether owned by the Company or operated by the Company to provide Internet access services to all of its ISP Customers and their End Users, either directly or through the Company's subsidiaries or Company's ISP Customers.

    1.7.  Content means advertising creative intended to convey a message, including through text, static or animated banner and buttons, graphical properties delivered to End Users through ADZILLA Services.

1.8. Clickstream Data means information that Company and its ISP Customers may agree to provide to ADZILLA regarding online navigations and transactions undertaken by End Users.

1.9 End User means any person or entity that accesses web pages through Company's Network.

1.10 End User Data means Clickstream Data and End User Information that is aggregated and anonymized consistent with the Privacy Policy set forth in Schedule D

1.11 End User Information means information that Company and its ISP Customers may agree to provide to ADZILLA regarding End Users including, but not limited to, type of ISP account (dial-up or broadband), postal code, gender, language, etc..

1.12. ISP Customers are those Internet access service providers to whom Company provides networking services that are technically capable of permitting use of the ADZILLA Technology via the Company Network.

1.13. Value-Added Services means services set forth in Exhibit C provided using ADZILLA's Technology that Company may offer to End Users directly or through its ISP Customers

2.  **ADZILLA Services**

2.1.  Advertising Display. ADZILLA will provide selected End Users of Company's Network with ADZILLA Content as set forth in Schedule B.

2.2.  Value-Added Services. ADZILLA will provide selected End Users of Company's Network with the Value-Added Services set forth in Schedule C.

3.  **Licenses Granted and Payment of Fees**

3.1.  ADZILLA Technology License.  Subject to the terms and conditions hereof, ADZILLA hereby grants to Company a worldwide, royalty-free, non-exclusive, non-transferable license to install and operate Adzilla Technology on Company's Network.

   3.1.1. Ownership.  Except as otherwise provided in this Agreement, as between ADZILLA and Company; Adzilla and its suppliers retain all rights, title and interest in and to all intellectual property rights embodied in or associated with ADZILLA Content, ADZILLA Services, and Adzilla Technology. There are no implied licenses under this Agreement, and any rights not expressly granted to a licensee hereunder are reserved by the licensor or its suppliers. Neither Party will exceed the scope of the licenses granted hereunder.

3.2.  Company License to Display Advertising. Subject to the terms and conditions hereof, Company hereby grants to ADZILLA for those Company facilities in which ADZILLA has installed and made operational its Technology, a non-exclusive (as per Section 3 2.2), non-transferable license to display Advertising to End Users in order to provide the ADZILLA Services. ADZILLA may display Advertising through the Adzilla Technology in order to provide the ADZILLA Services to certain End Users of ISP Customers as provided for in Section 6.3 of this Agreement and Section 6 of Schedule A.

   3.2.1. Licensing Fee. Company's fee from ADZILLA in exchange for granting the License to display Advertising is set forth in Schedule B.

   3.2.2.

3.3.  Company License to Gather and Use End User Data. Subject to the terms and conditions hereof, Company hereby grants to ADZILLA for those Company facilities in which ADZILLA installs and operates its Technology, a non-exclusive (as per Section 3.3.2), non-transferable license to use End User Data in order to provide the ADZILLA Services. ADZILLA may collect End User Data through the Adzilla Technology in order to provide the ADZILLA Services from certain End Users of ISP Customers as provided for in Section 6.3 of this Agreement and Section 6 of Schedule A.

3.3.1. **Licensing Fee.** Company's fee from ADZILLA in exchange for granting the License to gather and use End User Data is set forth in Schedule B.

3.3.2.

3.3.3. **Collection Limitations.** ADZILLA agrees that all End Users Data collected by ADZILLA will be limited to information reasonably related to the provision of the ADZILLA Services under this Agreement.

3.3.4. **Use Subject to Privacy Policy.** ADZILLA agrees that ADZILLA Services shall adhere to the Privacy Policy attached hereto as Schedule D. The Privacy Policy shall be consistent with the terms of this Agreement.

3.4. **Payments.** All payments due from Company to ADZILLA will be deducted from payments due to Company from ADZILLA under Schedules C (Data Access fees) and D (Advertising fees). All payments due from ADZILLA to Company will first be deducted from any payments due to Adzilla from Company and the balance of any payments due from ADZILLA to Company shall be made as provided for in Schedule B.

4. **ADZILLA Technology**

4.1. **ADZILLA Technology Installation.** Company agrees to allow ADZILLA to place ADZILLA Technology at one or more Company controlled data centers for the purpose of fulfilling Adzilla's obligations under this Agreement. ADZILLA agrees not to place any software on Company servers nor operate ADZILLA's Technology in any way so as to cause any harm, disruption, degradation or interference to Company's Network or ISP Customers. ADZILLA will have reasonable access to ADZILLA Technology during normal business hours. In the event Company determines that any ADZILLA Technology materially negatively impacts the operation of Company's Network, or results in harm, disruption, degradation or interference to ISP Customers, Company will have the right to immediately disconnect or discontinue the use of all such ADZILLA Technology until such time as ADZILLA remedies or removes the cause of such harm, disruption, degradation or interference. ADZILLA will install and deploy the ADZILLA Technology in stages as described in Schedule A attached hereto.

4.1.1. **Installation and Testing.** ADZILLA will work cooperatively with Company and at the direction of Company during the pre-installation testing, installation and post installation testing to ensure that the ADZILLA Technology has no negative impact on Company's Network or Company's ISP Customers. The ADZILLA Technology will not be activated in Company's Network until Company accepts in writing that the Adzilla Technology has been thoroughly tested in Company's Network and has passed all Company required tests.

4.1.2 **Installation Costs.** Company will be responsible for a one-time equipment installation fee and a monthly equipment rental fee. These fees are set forth in Schedule A and will be deducted from Company's licensing fee set forth in Schedule B.

4.1.3 **Maintenance and Upgrades.** Adzilla will provide at no cost to Company all of the necessary maintenance, software fixes and software and hardware replacements and upgrades to keep ADZILLA's Technology in good, working order, and will provide as Company any upgrades to ADZILLA's Technology intended to provide improved performance or additional features that Adzilla under the same terms that ADZILLA makes features available to any other Adzilla customer.

4.2. **Training.** ADZILLA will provide Company with training in the use of the ADZILLA Technology under the terms set forth in Schedule A.

4.2.1. **Training Costs.** Company will be responsible for training costs. These fees are set forth in Schedule A and will be deducted from Company's licensing fee set forth in Schedule B.

DM_VAN/280207-00001/6351380.2 ver 3

4.3. **Customer Selectivity.** Adzilla shall provide the means for Company to select which of Company's ISP Customers will receive ADZILLA Services. Company shall not be required to provide any additional software, alter any software or obtain any additional hardware in order to provide this customer selectivity. As part of this customer selectivity Adzilla shall provide reasonable means for any End Users of Company's Network to "opt out" of receiving Adzilla Services.

4.4. **Technology Return.** Within five business days of termination of this Agreement by either party, Company shall return all ADZILLA Technology, as well as any other documentation and other materials relating to the ADZILLA Technology, to ADZILLA, using pre-paid shipping waybill(s) provided by ADZILLA. Company's obligations under this Section will not be satisfied until Company certifies in writing to ADZILLA that it has not retained any ADZILLA hardware, software or documentation or related materials, or any copies of documentation or related materials.

4.5. **Technology Damage.** If any ADZILLA Technology is lost, damaged or stolen after delivery to Company, Company will be liable to ADZILLA for the cost of such Technology up to a maximum limit of $10,000 per unit, if such loss or damage is the sole result of negligence or willful acts on the part of Company. Adzilla agrees to be responsible for all other causes of loss or damage and to provide the minimum insurance required by Company's Co-location Service Supplemental Exhibit to the Master Services Agreement, which ADZILLA agrees to enter into prior to installing any Technology in Company's facilities.

5. **Reports.**

5.1. **Advertising Revenue Reports.** During the term of this Agreement, ADZILLA will provide Company with reports ("Reports") with respect to revenue from Advertising no later than five (5) days after any month for which the ADZILLA Technology is operational in Company's Network and such Reports will be provided in a mutually agreed upon format.

5.1.1. **Reporting By Customer.** ADZILLA agrees to provide Company with adequate reports with sufficient detail for Company to be able to report License Fee revenue from ADZILLA Services by ISP Customer.

5.2. **Inspection Rights.** During the term of this Agreement and for six (6) months thereafter, ADZILLA will maintain proper records and books of account relating to the Reports provided to Company. No more frequently than once every year, Company's designated auditing professional may inspect such records to verify ADZILLA's Reports to Company. Any such inspection will be conducted in a manner that does not interfere with ADZILLA's regular business activities. The auditing professional will enter into a confidentiality agreement in a form specified by ADZILLA, and will not disclose any of ADZILLA's records to Company. ADZILLA will immediately make any overdue payments disclosed by the audit plus applicable interest. Such inspection will be at the Company's expense unless such audit reveals an underpayment of more than 10% during any payment period, in which case the reasonable costs of such inspection will be at ADZILLA's expense.

6. **Representations and Warranties.**

6.1. **Mutual Representations and Warranties.** Each Party represents and warrants that: (i) it has full power and authority to enter into this Agreement and to perform all of its obligations hereunder, and (ii) its entry into this Agreement does not violate any other agreement by which it is bound.

6.2. **Company Representations and Warranties.** Company represents, warrants, covenants and agrees (a) that, if deemed necessary, it is responsible for securing the requisite permission from its ISP Customer before requesting Adzilla to perform the Services set forth in Section 2 for any specific ISP Customer, (b) to provide ADZILLA with full access to the ADZILLA Technology such that ADZILLA is able to remotely monitor and actively control services running on the ADZILLA Technology at all times, provided that ADZILLA complies with all reasonable requirements imposed on it by Company with respect to said access (c) to provide access to a publicly accessible

DM_VAN/260207-00001/6351380 2 ver 3

Page 4 of 22

IP address for the ADZILLA Technology, provided that ADZILLA complies with all reasonable requirements imposed on it by Company with respect to said access

**6.3. ADZILLA Representations and Warranties.** ADZILLA represents and warrants that: (a) to the best of its knowledge, the ADZILLA Technology does not contain any viruses, Trojan horses, worms, time bombs, cancelbots or other computer programming routines that are intended to damage, detrimentally interfere with, surreptitiously intercept or expropriate any system, data or personal information; (b) the ADZILLA Services, ADZILLA Technology and/or ADZILLA Content do not and will not contain any technology, content, data, work, materials, link, advertising or services that violate any applicable law or regulation or infringe or misappropriate any proprietary, intellectual property, contract or tort right of any person or party. ADZILLA further represents and warrants that it will make commercially reasonable efforts to ensure that: (i) the ADZILLA Services will be performed, and the goods, materials, documentation, analysis, data, programs, and other matter contemplated in performing hereunder will be prepared and delivered, by qualified personnel in a good and workmanlike manner in accordance with this Agreement and (ii) that it will not accept any Media that contains indecent, obscene or pornographic material, hate speech, highly explosive subject matter (as determined by ADZILLA, Company or any applicable legislative or regulatory body), any illegal subject matter or activities or any other content that does not meet the Network Quality standards as in effect from time to time (collectively referred to as the "Prohibited Content"); (c) ADZILLA will not replace, alter or remove any ad or other content without the prior written consent of the publisher or owner of said ad or content; (d) ADZILLA will not present Interstitial or similar type advertisements to any End User without prior written consent of Company, and will only present Interstitial or similar type advertisements when specifically authorized by the affected ISP Customer; (e) ADZILLA will not present Insertion or similar type advertisements to any End User without prior written consent of Company, and will only present Insertion or similar type advertisements when specifically authorized by the affected ISP Customer (f) ADZILLA will not present any Pop-Up or Pop-Under advertisements without prior written consent of Company, and will only present Pop-Up or Pop-Under advertisements when specifically authorized by the affected ISP Customer; (g) ADZILLA will not use any Clickstream Data or End User Information without prior written consent of Company.

**6.4. Disclaimer of Other Warranties.** EXCEPT AS EXPRESSLY STATED HEREIN, EACH PARTY DISCLAIMS ALL WARRANTIES AND CONDITIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY REPRESENTS NOR WARRANTS THAT ITS SITE OR TECHNOLOGY WILL OPERATE SECURELY OR WITHOUT INTERRUPTION. Each Party acknowledges that it has not entered into this Agreement in reliance upon any warranty or representation except those specifically set forth herein.

**6.5. NO INDIRECT DAMAGES.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PARTY FOR INDIRECT DAMAGES OR LOSSES (IN CONTRACT OR IN TORT) IN CONNECTION WITH THE TECHNOLOGY, THE NETWORK OR THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOST PROFITS, LOST SAVINGS, OR INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES, EVEN IF CAUSED BY PARTY'S NEGLIGENCE AND EVEN IF PARTY HAS KNOWLEDGE OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE.

**7. Intellectual Property**

**7.1. No Reverse Engineering.** Company will not at any time, whether before, during or after the Term of this Agreement reverse engineer, disassemble or decompile the ADZILLA Technology or any part thereof or prepare derivative works thereof. Company shall not copy, transfer, display or use the ADZILLA Technology except as expressly authorized in writing by ADZILLA.

**7.2. Ownership of Inventions.** The parties hereby agree that ADZILLA is and will be the exclusive and irrevocable owner of all Inventions that may result from knowledge gained during the trial deployment, and whether such invention is made by ADZILLA, by Company, or jointly. Company will promptly execute and deliver to ADZILLA at the cost of ADZILLA such further documents

and assurances and take such further actions as ADZILLA may from time to time reasonably request in order to more effectively carry out the intent and purpose of this Section and to establish and protect the rights, interests and remedies intended to be created in favor of ADZILLA.

7.3. **Retention of Rights by ADZILLA.** All proprietary and intellectual property rights, including copyright, in and to the original and all copies of the ADZILLA Technology, all software components thereof, the documentation or any changes or modifications made to any of them shall be and remain that of ADZILLA. Company has no rights in or to the Equipment, all software components thereof, the documentation or any changes or modifications made to any of them, except as granted herein. Company shall not at any time whether before or after the termination of this Agreement contest or aid others in contesting, or do anything or aid others in doing anything which otherwise impairs the validity of, any intellectual property rights of ADZILLA in and to the ADZILLA Technology, all software components thereof, the documentation or any changes or modifications made to any of them.

## 8. TERM AND TERMINATION.

8.1. **Term.** The term of this Agreement will begin on the Effective Date and end on the Fifth anniversary of the Effective Date and will renew automatically for one (1) year terms (each a "Renewal Term") unless (a) either Party notifies the other in writing at least thirty (30) days prior to the end of the then-current Initial Term or Renewal Term that it will not renew the Agreement, or (b) earlier terminated as provided in this Agreement. The Initial Term and any additional Renewal Term(s) or portion(s) thereof until the Agreement is terminated will collectively be referred to herein as "Term".

8.2. **Installation Completion Date.** After ADZILLA's Technology has been successfully installed on Company-controlled premises, tested by the Company and determined to be working to the Company's reasonable satisfaction then, the parties will sign an "Installation Completion" form indicating that the ADZILLA Technology and Services have been installed and are operational.

8.3. **Termination.** The Agreement may be terminated by either party for any reason or no reason during the first 60 days after the Installation Completion Date by providing written notice to the other party. This Agreement will be terminable at the discretion of the injured Party, prior the end of the Term: (a) if a Party materially breaches this Agreement and does not cure such breach within thirty (30) days following written notice thereof from the non-breaching Party; (b) upon the admission by the other Party in writing of the inability to pay debts generally as they become due or the taking of any corporate action tantamount to such admission; (c) upon the other Party ceasing to do business as a going concern; (d) upon the other Party making any assignment for the benefit of creditors; (e) immediately by the non-breaching Party in its sole discretion upon the other party's material breach of Sections 10 ("Confidential Information") or 7.1 ("Reverse Engineering"); (f) upon the mutual written agreement of the Parties.

## 9. Indemnification and Limitations of Liability

9.1. ADZILLA shall defend, indemnify, and hold harmless Company, its officers and directors, employees, and agents from and against any and all lawsuits, claims, demands, penalties, losses, fines, liabilities, damages, and expenses (including attorney's fees) of any kind and nature (including damage to Company's property and injury to its employees), without limitation whatsoever, in connection with ADZILLA's operations, installation or maintenance of ADZILLA's Technology contemplated by this agreement, or otherwise arising out of or in any way connected with ADZILLA's provision of service or performance under this agreement; provided that this section shall not apply to the extent that any injury, loss, or damage is caused by the gross negligence or willful misconduct on the part of Company.

9.2. ADZILLA shall defend or settle any claim made or any suit or proceeding brought against Company insofar as such claim, suit or proceeding is based on an allegation that ADZILLA's Technology supplied to Company pursuant to this Agreement infringes the patent, copyright or other intellectual property rights of any third party, provided that Company shall notify ADZILLA in writing promptly after the claim, suit or proceeding is known to Company and shall give to

ADZILLA such information and such assistance as is reasonable in the circumstances. ADZILLA shall have sole authority to defend or settle the same at ADZILLA's expense. ADZILLA shall indemnify and hold Company harmless from and against any and all such claims and shall pay all damages and costs finally agreed to be paid in settlement of such claim, suit or proceeding, or awarded in any final judgment or arbitration proceeding. This indemnity does not extend to any claim, suit or proceeding based upon any infringement or alleged infringement of copyrights, patents or other intellectual property rights resulting by Company's combination of ADZILLA's Technology with other elements provided by Company, nor does it extend to any subsequent alteration of ADZILLA's Technology by Company either by enhancement or by combination with product(s) of Company's design. If in any claim, suit or proceeding ADZILLA's Technology is held to infringe any proprietary or intellectual property rights of any third party and the use thereof is enjoined or, in the case of settlement as referred to above, prohibited, ADZILLA shall have the option, at its own expense, to either (i) obtain for Company the lawful right to continue using the infringing item, or (ii) replace the infringing item or modify it so that it becomes non-infringing; provided that no such replacement or modification shall diminish the performance of ADZILLA's Technology.

9.3.  Company shall defend, indemnify, and hold harmless ADZILLA, its officers and directors, employees, and agents from and against any and all lawsuits, claims, demands, penalties, losses, fines, liabilities, damages, and expenses (including attorney's fees) of any kind and nature (including damage to ADZILLA's property and injury to its employees), without limitation whatsoever, in connection with Company's operations, installation or maintenance of Company's Network contemplated by this agreement, or otherwise arising out of or in any way connected with Company's provision of service or performance under this agreement; provided that this section shall not apply to the extent that any injury, loss, or damage is caused by the gross negligence or willful misconduct on the part of ADZILLA.

9.4.  Company shall defend or settle any claim made or any suit or proceeding brought against ADZILLA insofar as such claim, suit or proceeding is based on an allegation that Company technology operated by Company pursuant to this Agreement infringes the patent, copyright or other intellectual property rights of any third party; provided that ADZILLA shall notify Company in writing promptly after the claim, suit or proceeding is known to ADZILLA and shall give to Company such information and such assistance as is reasonable in the circumstances. Company shall have sole authority to defend or settle the same at Company's expense. Company shall indemnify and hold ADZILLA harmless from and against any and all such claims and shall pay all damages and costs finally agreed to be paid in settlement of such claim, suit or proceeding, or awarded in any final judgment or arbitration proceeding. This indemnity does not extend to any claim, suit or proceeding based upon any infringement or alleged infringement of copyrights, patents or other intellectual property rights resulting by ADZILLA's combination of ADZILLA's Technology with other elements provided by Company's Network by ADZILLA either by enhancement or by combination with product(s) of ADZILLA's design. If in any claim, suit or proceeding Company's Network is held to infringe any proprietary or intellectual property rights of any third party and the use thereof is enjoined or, in the case of settlement as referred to above, prohibited, Company shall have the option, at its own expense, to either (i) obtain for Company the lawful right to continue using the infringing item, or (ii) replace the infringing item or modify it so that it becomes non-infringing; provided that no such replacement or modification shall diminish the performance of Company's Network.

9.5.  EXCEPT FOR ITS OBLIGATION NOT TO TRANSFER, SUBLICENSE (SECTION 3.1) OR REVERSE ENGINEER (SECTION 7.1) THE ADZILLA TECHNOLOGY, OR ITS INDEMNIFICATION OBLIGATIONS (SECTION 9) OR CONFIDENTIALITY OBLIGATIONS (SECTION 10), Company's liability, if any, for damages arising out of its negligent acts, or mistakes, omissions, interruptions, delays, errors, or defects during the course of furnishing service to ADZILLA, shall in no event exceed an amount equivalent $50,000 during the period affected by such negligence, or in which such mistakes, omissions, interruptions, delays, errors, or defects occurred. Any mistakes, omissions, interruptions, delays, errors, or defects that are caused by or materially contributed to by the negligence or willful acts of Adzilla, or that arise from facilities or

equipment used by Adzilla and not provided by Company, shall not result in the imposition of any liability upon Company

9.6.  EXCEPT FOR ITS INDEMNIFICATION OBLIGATIONS (SECTION 9) OR CONFIDENTIALITY OBLIGATIONS (SECTION 10), ADZILLA's liability, if any, for damages arising out of its negligent acts, or mistakes, omissions, interruptions, delays, errors, or defects during the course of furnishing service to Company, shall in no event exceed an amount equivalent $50,000 during the period affected by such negligence, or in which such mistakes, omissions, interruptions, delays, errors, or defects occurred. Any mistakes, omissions, interruptions, delays, errors, or defects that are caused by or materially contributed to by the negligence or willful acts of Company, or that arise from facilities or equipment used by Company and not provided by ADZILLA, shall not result in the imposition of any liability upon ADZILLA . .

9.7.  Company will not be liable for any act, omission to act, negligence, or defect in the quality of service of any underlying carrier or other service provider whose facilities or services are used in furnishing any portion of the service received by ADZILLA. Company will not be liable for any failure of performance that is caused by or the result of any act or omission by ADZILLA or any entity other than Company, that furnishes services, facilities, or equipment used in connection with Company's services or facilities.

9.8.  ADZILLA will not be liable for any act, omission to act, negligence, or defect in the quality of service of any underlying carrier or other service provider whose facilities or services used in furnishing any portion of the service received by Company. ADZILLA will not be liable for any failure of performance that is caused by or the result of any act or omission by Company or any entity other than ADZILLA, that furnishes services, facilities, or equipment used in connection with ADZILLA's services or facilities.

10.  <u>Confidential Information.</u>  Company and ADZILLA confirm that any existing Mutual Non-Disclosure Agreement is superseded by the provisions of this Article 10 of this Agreement.

10.1. In connection with performing pursuant to this Agreement, the parties acknowledge that they may disclose and/or receive Confidential Information proprietary to the other party. "Confidential information" is all information proprietary to Company or to ADZILLA, whether or not reduced to writing or other tangible medium of expression, and whether or not patented, patentable, capable of trade secret protection, or protected as an unpublished or published work under the United States Copyright Act. Confidential Information also includes information relating to the intellectual property and business practices of Company or ADZILLA, including information relating to research and development, inventions, discoveries, developments, improvements, methods and processes, know-how, drawings, blueprints, specifications, product briefs, algorithms, computer programs and software, compositions, works, concepts, designs, ideas, prototypes, models, samples, screens, molds, patents, copyrights, trademarks, trade names, trade secrets, formulae, writings, notes, and patent, trademark, and copyright applications. Unless the nature of the Confidential Information clearly makes it obvious on the face to the other Party then Party to whom the Confidential Information belongs must advise the other Party that such information is Confidential Information. Normally this will be accomplished by marking written documents with the words "Confidential" or "Confidential Information" or "Proprietary" and contemporaneously stating that any Confidential Information given verbally is Confidential Information, followed up by a written confirmation of the confidential nature by email or other means. For the purposes of this agreement, all ADZILLA Technology should be considered Proprietary and is classified as Confidential Information. Confidential Information does not include information which (i) was already known to the other party, (ii) becomes generally available to the public other than through a breach of this Agreement, (iii) is furnished to the other party by a third party who is lawfully in possession of such information and who lawfully conveys that information, or (iv) is subsequently developed by the receiving party independently of the information received from the disclosing party. The parties agree to take reasonable steps to protect the other's Confidential Information. The parties agree not to: (a) use or copy, except as required by the normal and proper course of performing under this Agreement, (b) disclose or allow third party's access to, the other's Confidential Information without the other party's express prior written consent or as may be

required by law or by action of a competent government authority subject to the party compelled to disclose good faith efforts to meet such requirement subject to a confidentiality agreement or protective order. These restrictions will continue to apply as long as the confidential nature of the Information is maintained and shall survive the expiration or termination of this Agreement for a maximum period of time of three years.

11. **Publicity**

11.1. Subject to the conditions in section 11.3, ADZILLA shall be permitted to identify Company as a Service Enabler for Internet Access Service Providers or ISPs, to use Company's name in connection with proposals to prospective publishers, to hyperlink from ADZILLA's web site to Company's home page, to display Company's logo on the ADZILLA web-site, and to otherwise refer to Company in print or electronic form for marketing or reference purposes. Company agrees to serve as a reference in ADZILLA's proposals for contact by prospective customers and analysts.

11.2. Subject to Section 11.3, Company shall be permitted to identify ADZILLA as a provider of Internet Advertising and / or value added services, to use ADZILLA's name in connection with proposals to prospective customers and when discussing Company's business with others, to hyperlink from Company's web site to ADZILLA's home page, to display ADZILLA's logo on the Company web site, and to otherwise refer to ADZILLA in print or electronic form for marketing or reference purposes. ADZILLA agrees to serve as a reference and source of information in Company's proposals for contact by prospective customers and analysts. ADZILLA also agrees to the extent that ADZILLA has resources available at that time to provide telephone or in person participation in sales calls and proposals by Company for Company's product or service offerings that use or incorporate ADZILLA's Technology.

11.3. **Prior Consent.** Each Party must obtain written approval from the other Party of any communication, written, verbal, visual or otherwise that would be made available to a third party. Each Party shall use reasonable means to ensure that all of its officers and directors, employees, and agents are aware of and comply with this requirement.

12. **Arbitration**

12.1. In the event of a dispute as it relates to performance or adherence to the terms and conditions of this contract, if the Parties elect to seek arbitration from an independent arbitrator, the Parties agree to be bound by the judgment of the independent arbitrator upon presentation and disclosure of the known facts to the arbitrator.

12.2. In the event that any dispute shall occur among the parties to this agreement with respect to any matter related to the agreement which can not be resolved by the mutual agreement of the parties, including but not limited to the interpretation or application of any term of this agreement, or the determination of whether any party is in default of their obligations under this agreement, or the assessment of any damages suffered by any party as a result of a default by any other party under this agreement, then the matter in dispute may be resolved by binding arbitration at the option of any party who may at any time require arbitration (including before or after the commencement of any litigation between the parties) by giving written notice of the requirement for arbitration (included a statement of the matter to be arbitrated) to all the other parties to this agreement. Any such arbitration shall proceed in accordance with the then current International Arbitration Rules of the American Arbitration Association ("AAA"), except as modified by this paragraph. The panel of arbitrators shall consist of three arbitrators chosen by the parties from a slate of at least eight candidates provided by the AAA, or chosen by the AAA if the parties cannot agree upon the three arbitrators within five business days of delivery of the original slate by the AAA to the parties. The decision of the arbitrators shall be final and binding and no party shall have rights of appeal. Provided that the existence of the arbitration proceedings set out above shall not prevent any party from seeking the appropriate interim, injunctive or equitable relief from a court of competent jurisdiction during the course of any dispute or arbitration proceeding and pending the outcome of same.

13. **Miscellaneous**

DM_VAN#260207-00001/6361360.2 ver 3

13 1 **Governing Law.** This Agreement will be governed by and construed in accordance with the substantive laws of New York, and the federal laws of the United States, without regard to the conflict of law rules of New York.

Deleted: [Washington, California,
Deleted: —any U.S state
Deleted: [STATE OF ADZILLA'S CHOICE].

13.2. **International Sale of Goods Act.** The International Sale of Goods Act of British Columbia and the United Nations Convention on Contracts for the International Sale of Goods will not apply in any way to this Agreement or to the transactions contemplated by this Agreement or otherwise to create any rights or to impose any duties or obligations on any party to this Agreement  Any rights which have arisen or which might in the future arise under the International Sale of Goods Act or the United Nations Convention on Contracts for the International Sale of Goods are waived and released by all parties to this Agreement.

13.3. **Notices.** All notices required or permitted to be given under this Agreement shall be in writing and either hand-delivered, mailed by certified first class mail, postage prepaid, sent by national overnight courier service, or sent via facsimile confirmed by telephone to the other party or parties hereto at the address(es) or telephone numbers set forth on the signature page to this Agreement or as shall be designated from time to time.  A notice shall be deemed given when delivered personally, when the facsimile notice is transmitted by the sender and confirmed by telephone, upon receipt of confirmation by the overnight delivery service or three business days after mailing by certified first class mail.

13.4. **Severability.** The invalidity of one or several provisions of this Agreement shall not affect the validity of this Agreement as a whole, unless the invalid provisions are of such essential importance to this Agreement that it is to be reasonably assumed that the parties would not have entered into this Agreement without the invalid provisions. If any provision or portion of this Agreement is deemed invalid or unenforceable for any reason, there shall be deemed to be made such minimum change to such provision or portion as is necessary to make it valid and enforceable as so modified.

13.5. **Survival of Provisions.** Any obligations of the Parties relating to monies owed, as well as those provisions relating to confidentiality, limitations on liability and indemnification, shall survive termination of this Agreement.

13.6. **Headings.** Headings are included in this Agreement for convenience only and shall not affect the construction or interpretation of this Agreement.

13.7. **Cumulative Rights and Remedies.** Except as otherwise provided for herein, the assertion of a Party of any right or the obtaining of any remedy hereunder shall not preclude such Party from asserting or obtaining any other right or remedy, at law or in equity.

13.8. **Relationship of Parties.** Company and ADZILLA shall each act as independent contractors  Neither party shall exercise control over the activities and operations of the other party, nor enter into any commitment on behalf of the other, except as expressly provided for by this Agreement.  Nothing in this Agreement shall be construed as creating an association, trust, partnership, agency or joint venture between the Parties in any respect or in regard to any undertaking.

13.9. **Force Majeure.** Neither party shall be held liable or responsible to the other party nor be deemed to have defaulted under or breached this Agreement for failure or delay in fulfilling or performing any term of this Agreement, except for the obligations to make payments required under this Agreement, when such failure or delay is caused by or results from causes beyond the reasonable control of the affected party, including but not limited to fire, floods, failure of communications systems or networks, embargoes, war, acts of war, insurrections, riots, civil commotion, strikes, lockouts or other labor disturbances, acts of God or acts, omissions or delays in acting by any governmental authority or the other party; provided, however, that the party so affected shall use reasonable commercial efforts to avoid or remove such causes of nonperformance, and shall continue performance hereunder with reasonable dispatch whenever such causes are removed  Either party shall provide the other party with prompt written notice of any delay or failure to

perform that occurs by reason of force majeure. The parties shall mutually seek a resolution of the delay or the failure to perform as noted above.

13.10.    **No Assignment.** This Agreement is not assignable by either Party in whole or in part without the prior written consent of the other Party which shall not be unreasonably withheld, except assignment to a wholly owned subsidiary or affiliate held under common control with said first Party, in which case no prior consent of the second Party is required. Notwithstanding the foregoing, either Party may assign this Agreement to an entity that acquires said Party or virtually all of its assets or into which said Party is merged, upon providing the other Party with forty-five (45) days notice of such assignment. This Agreement shall be binding upon the heirs, successors, subcontractors, and assigns of either Party.

13.11.    **Counterparts and Fax Signatures.** This Agreement may be executed in any number of counterparts with the same effect as if both parties had signed the same document. All of these counterparts will for all purposes constitute one agreement, binding on the parties, notwithstanding that both parties are not signatories to the same counterpart. A fax transcribed copy or photocopy of this Agreement executed by a party in counterpart or otherwise will constitute a properly executed, delivered and binding agreement or counterpart of the executing party. Each Party intends that a facsimile of its signature printed by a receiving fax machine may be regarded as an original signature.

13.12.    **Construction.** This Agreement has been negotiated by the parties hereto and by their respective counsel. No provision of this Agreement will be interpreted in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

13.13    **Conflict.** If there is any conflict between any provision of this Agreement and the Schedules, then the provisions of the Agreement shall be deemed to be ruling.

13.14.    **Modification By Regulatory Authorities.** This agreement shall at all times be subject to modification necessary to incorporate any changes, revisions or modifications the Federal Communications Commission or the applicable Public Utilities Commission or other applicable regulatory body may, from time to time, direct in the exercise of its jurisdiction, or to pass on to ADZILLA any charges or fees either commission or other regulatory body imposes on Company, or authorizes other carriers to charge Company, for services being provided by Company to ADZILLA. In the event that the actions of a regulatory authority result in a material modification to this Agreement at any time, any adversely affected Party may terminate this Agreement, without liability, upon 30 days' notice to the other Party. Such notice shall be provided no later than sixty (60) days after the effective date of such modification.

13.15.    **Entire Agreement.** This Agreement supersedes all previous invitations, proposals, letters, correspondence, negotiations, promises, agreements, covenants, conditions, representations and warranties with respect to the subject matter of this Agreement. There is no representation, warranty, collateral term or condition or collateral agreement affecting this Agreement, other than as expressed in writing in this Agreement. No trade terms or trade usages are to be incorporated by reference impliedly or otherwise into this Agreement, unless expressly referred to in this Agreement. No change or modification of this Agreement will be valid unless it is in writing and signed by each party to this Agreement.

SCHEDULE A
ADZILLA Technology Implementation

**1. List of Adzilla Technology at Company's Network Operations Center(s)**

| Location Name | Location Address | Required Equipment to Be Managed and Maintained By ADZILLA |
|---|---|---|
| [ POP #] | TBD | TBD |

**2. Location of Company's Network Operations Center(s).**

| Location Name | Location Address | Basic Description of Company's Network | Required Equipment to Be Managed and Maintained By Company |
|---|---|---|---|
| [ POP #] | USA | LATAs -company to identify<br>LATAs company to identify<br><br>• Network Type<br>• Approximate number of Accessible End Users<br>• Upstream network connectivity to be provided | TBD |

**3. Implementation Schedule**

The dates outlined in this schedule are mutually agreed upon target dates between the Company and ADZILLA for the deployment and integration of the Technology including the Zillacaster and other network equipment as required. The following items are ADZILLA's responsibilities as part of the installation of ADZILLA's Technology at each of the Company's locations.

POP#1

| | Deliverable Item | Due Date |
|---|---|---|
| 1. | Completion of Preliminary Technical Network Summary | Contract Signing |
| 2. | Pre-Engineering Report completed after ADZILLA receives Network Documentation from Company | Date to be determined |
| 3. | Installation of cache and other required equipment on Company's network | Date to be determined |
| 4. | Completion of cache testing and network configuration | Date to be determined |
| 5. | Zillacaster activated on Company's network | Date to be determined |
| 6. | Completion of Zillacaster testing | 10 calendar days from Zillacaster activation |
| 7. | Integration of data from Company as outlined in Data Access section of Schedule A. | 15 calendar days from Zillacaster activation |
| 8. | Training for Company staff | Date to be determined |
| 9. | Acceptance Testing | Date to be determined |
| 10. | Installation Completion Date | Upon Company sign off on Acceptance Test |

3.1. Company, shall provide access to a publicly accessible IP addresses for the Zillncastor(s), cache(s) and IP addressable power supply (if used). Such addresses are typically provided using a subnet/VLAN on the service provider's network for exclusive use by Adzilla.

3.2. Company shall provide the appropriate location and environment to install the ADZILLA Technology (co-location space, power, air conditioning, remote access, and rack space). The location for the installation of the ADZILLA Technology shall be made available in each Company facility that will be used for an ADZILLA Technology installation, at a time and in a manner determined by Company that will be minimally interruptive of Company's activities.

3.3 Both Parties shall require their technical and engineering staff to work collaboratively with the other Party's technical and engineering staff so Adzilla can complete a Pre-Engineering Report (as described in Schedule A) which will help Adzilla and Company clarify relevant Zillacaster deployment details in advance of installation and to work towards a problem free and smooth installation of the ADZILLA Technology.

4. **Additional Equipment**

During the term of this Agreement, additional sites may be identified for Technology deployment. ADZILLA and the Company agree to negotiate in good faith terms under which ADZILLA can deploy ADZILLA's Technology at such future locations and geographic territories with an Addendum to this Schedule A. All Addendums will be subject to the terms and conditions of this Agreement.

5. **Installation.**

5.1. Scope and Duration. Adzilla will be responsible for completing the installation of Adzilla's Technology as set forth in Schedule A, Section 3.

5.2. Fees. The following installation fees, normally due from Company to ADZILLA, are hereby waived.

5.2.1. Equipment installation fee is $6,000.

5.2.2. Equipment rental fee is $500 per month for each POP with ADZILLA equipment.

5.3. Installation of Additional Services. If Company subsequently desires that ADZILLA provide additional services, Company shall pay for such additional installation services on a time and materials basis as well as reimburse all reasonable out-of-pocket expenses incurred in the course of providing such additional installation services. This provision is intended to cover additional services requested by Company that would be outside of services needed to effect a complete installation of ADZILLA's Technology. Such additional services would include integrating ADZILLA's Technology with Company's billing database, or consulting services in connection with Company's Radius configuration.

6. **Data Access.**

6.1. ADZILLA further acknowledges that all End User Data may be subject to privacy or other applicable laws, rules or regulations such as the Customer Proprietary Network Information (CPNI) regulations and ADZILLA agrees to abide by and comply with any applicable laws, rules and regulations.

7. **Training.**

7.1. Scope and Duration. Company will receive sufficient copies of all documentation regarding operations of the ISP Control Center (ICC) as well as up to twelve (12) hours of web-based training for each POP where ADZILLA's Technology is installed.

7.2. Fees. The training fees of $2000 for twelve (12) hours of web-based training for each POP, normally due from Company to ADZILLA, are hereby waived.

7.3. Training for Upgrades, Changes and Revisions. If ADZILLA makes any change, upgrade or revision to its Technology that will be installed in or is likely to affect Company's Network then ADZILLA shall provide at no charge to Company, adequate and timely training for Company on those changes, upgrades or revisions.

7.4. Additional Training. If Company subsequently desires that ADZILLA provide additional training, Company shall pay for such additional training services on a time and materials basis as well as reimburse all reasonable out-of-pocket expenses incurred in the course of providing such additional training services.

## SCHEDULE B
### Licensing Fees

1. **Agreement Termination Date.**

   1.1. The Parties agree that this Agreement will terminate on the Fifth anniversary of the Effective Date of this Agreement.

2. **Licensing Fees**

   2.1. **Fee Calculation.** In exchange for the licenses granted in Sections 3.2 and 3.3 of the Agreement, Company will receive a portion of the Net Revenue ADZILLA collects from Advertising on Company's Network (hereinafter called "Licensing Fee"). The Licensing Fee will be calculated by multiplying the Company's Revenue Share Percentage as defined in Section 1.2 below and the monthly Net Revenue, as calculated in Section 1.4 below

   2.2. **Revenue Share Percentage.** The Revenue Share Percentage is determined by adding the Base Percentage, the Length of Term percentage and the Early Adopter percentage.

      2.2.1. The Base Percentage is 25% of Net Revenue.

      2.2.2. The Length of Term percentage is 10%.

      2.2.3. The Early Adopter percentage is 5% of Net Revenue.  Adzilla agrees that no other company shall be offered an Early Adopter Fee, after the effective date of this Agreement.

   2.3. **Revenue Pool.** Monthly Net Revenue will consist of revenue generated from the following revenue streams each month:

      2.3.1. **In-Page Advertising Optimization ("Optimization").** ADZILLA will perform Advertising Optimization when End Users navigate to a Web Page in ADZILLA's publisher network and ADZILLA has the right, but not the obligation, to replace low-yielding and less relevant in-page advertisements, with in-page advertisements, which are higher-yielding and more relevant to the End User.

      2.3.2. **Insertion Advertising ("Insertion").** Only with ISP Customer's consent, ADZILLA may insert advertisements above the End User's requested Web page such that the Inserted ad is seen at the top of the End User's screen and the requested web page is "pushed down" on the screen to a position directly below the Inserted ad

      2.3.3. **Interstitial Advertising ("Interstitials").** Only with ISP Customer's consent, ADZILLA may insert advertisements in a separate browser page while the End User is waiting for a requested Web page to load.

      2.3.4. **Pop-Up or Pop-Under Advertising.** Only with ISP Customer's consent, ADZILLA may insert advertisements in a separate browser window that is displayed over (Pop-Up) or under (Pop-Under), content that the End User is viewing.

   2.4. **Net Revenue Calculation.** For the purposes of this Agreement, Net Revenue is equal to all Advertising revenue generated from ADZILLA Services offered on Company's Network ("Gross Revenue") less inventory and advertising sales costs. Such costs will include the actual cost paid to members of the ADZILLA Publisher Network, including interest and fees paid by ADZILLA to obtain access rights to place ads on websites. ADZILLA expects that it will only pay members of the ADZILLA Publishers Network for the Optimization advertisements and does not expect to pay members of the ADZILLA Publishers Network for Insertion or Interstitial advertisements.

   2.5. **ADZILLA Fees.** ADZILLA's monthly Licensing Fee payment to Company will be reduced by any implementation and equipment rental costs set forth in Schedule A or Value Added Services costs set forth in Schedule C and owed by Company to ADZILLA

2.6. **Bad Debt Reserve**. ADZILLA will withhold up to 5% of Gross Revenue to offset expected bad debt

3. **Ad Referral Commission**

3.1. ADZILLA will pay Company a one-time commission of 15% on Gross Revenue collected from Advertisers that Company refers to ADZILLA, so long as such Advertisers have not advertised through Adzilla during the 12 months prior to the Company's referral. This referral commission applies only to the referred Advertiser's initial campaign.

4. **Timing of Payments**. ADZILLA shall pay Company its share of Net Revenues within sixty (60) days of the end of the month in which Advertising is delivered to Company's End Users.

SCHEDULE C
Value Added Services

1   **Services Selected.** Adzilla will provide any of the following Value Added Services to the Company under the following terms, and if during the Term of this Agreement ADZILLA offers any of these Value Added Services to any other customer for less that $0.07 then ISP Customer's of Company shall also be offered the same lower price:

| Item | Price per Subscriber per Month | Promotional Price |
|------|-------------------------------|-------------------|
| Communications Tool | $0.07 | Company's ISP Customers who participate in receiving ADZILLA Services shall have free use of the ADZILLA customer billing and communications tools for 12 months from the date said ISP Customer signs up for ADZILLA Content Display services. |
| Collections Tool | $0.07 | Company's ISP Customers who participate in receiving ADZILLA Services shall have free use of the ADZILLA customer billing and communications tools for 12 months from the date said ISP Customer signs up for ADZILLA Services. |

2.  **Payment.** If Company bills its ISP Customers directly for Adzilla provided Value-Added Services, then Adzilla will deduct payment for Value-Added Services from Advertising-related payments due to Company under Section 1.5 of Schedule B. The Company may subscribe for and/or cease a subscription for any Value Added Services at any time or times during the Term in accordance with the provisions of this Section 2 of Schedule C, and any payment therefore shall commence and/or cease accordingly.

## SCHEDULE D
### Privacy Policy

ADZILLA is dedicated to the protection of privacy. The ADZILLA Technology and ADZILLA Services adhere to the following policies:

ADZILLA is committed to protecting the privacy of ISP end users. This document is an explanation of ADZILLA's Privacy Policy for ISP end users ("you"). This Policy applies to all of the products and services offered by ADZILLA Inc. or its subsidiaries (collectively, ADZILLA "products").

ADZILLA adheres to the US safe harbor privacy principles of Notice, Choice, Onward Transfer, Security, Data Integrity, Access and Enforcement.

**Information we collect and how we use it:**

**\* Information that you provide to ISPs**

When you sign up for Internet service, you provide your ISP with personal information. Your ISP may provide us with access to this information so that we can provide you with a better Internet browsing experience and to improve the quality of our service. At no time will your personal information leave the ISP.

**\* Cookies**

Our ad serving partners may send one or more cookies- a small file containing a string of characters- to your computer that uniquely identifies your browser. They use cookies to improve the quality of their service by limiting ad display frequency, storing user preferences and tracking user trends. Most browsers are initially set up to accept cookies, but you can reset your browser to refuse all cookies or to indicate when a cookie is being sent. However, some features and services may not function properly if your cookies are disabled.

**\* Log Information**

When you use certain ADZILLA products (such as the ZILLAcaster), our servers automatically record information that your browser sends whenever you visit a website. These server logs may include information such as your web request, Internet Protocol address, browser type, browser language, and the date and time of your request.

**\* User Communication**

When you send email or other communication to ADZILLA, we may retain those communications in order to process your inquiries, respond to your requests and improve our service.

**\* Affiliated Sites**

We offer some of our services in connection with other web sites. Personal information that you provide to those sites may be sent to ADZILLA in order to deliver the service. We process such information in accordance with this Policy. The affiliated sites may have different privacy practices and we encourage you to read their privacy policies.

ADZILLA only processes personal information for the purposes described in this Privacy Policy. In addition to the above, such purposes might include:

- Providing our products and services to users, including the display of customized content and advertising;
- Auditing, research, and analysis in order to maintain, protect and improve our services;
- Ensuring the technical functioning of our network; and
- Developing new services.

**Choices for personal information**

If we propose to use personal information for any purpose other than those described in this Policy, we will offer you an effective way to opt out of the use of personal information for those other purposes. We will not collect or use any information relating to confidential medical information, racial or ethnic origins, political

or religious beliefs or sexuality and tied to personal information ("sensitive personal information") for purposes other than those described in this Policy, unless we have obtained your prior consent.

So long as your ISP assigns you a static IP address or Radius identifier, you may choose to opt-out of our services at any time.

## Information sharing

ADZILLA only shares personal information with other companies or individuals outside ADZILLA in the following limited circumstances:

- We have your consent. We require opt-in consent for the sharing of sensitive personal information.

- We provide such information to our subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on our behalf. We require that these parties agree to process such information based on our instructions and in compliance with this Policy and any other appropriate confidentiality and security measures.

- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Services including investigation of potential violations thereof, (c) detect, prevent, or otherwise address fraud, security or technical issues, or (d) protect against imminent harm to the rights

If ADZILLA becomes involved in a merger, acquisition, or any form of sale of some or all of its assets, we will provide notice before personal information is transferred and becomes subject to a different privacy policy.

We may share with third parties certain pieces of aggregated, non-personal information, such as the number of users who browsed to a certain website, for example, or how many users clicked on a particular advertisement. Such information does not identify you individually.

Please contact us at the address below for any additional questions about the management or use of personal data.

## Information security

We take appropriate security measures to protect against unauthorized access to or unauthorized alteration, disclosure or destruction of data. These include internal reviews of our data collection, storage and processing practices and security measures, as well as physical security measures to guard against unauthorized access to systems where we store personal data.

We restrict access to ADZILLA employees, contractors and agents who need to know that information in order to operate, develop or improve our services. These individuals are bound by confidentiality obligations and may be subject to discipline, including termination and criminal prosecution, if they fail to meet these obligations.

## Data Integrity

ADZILLA processes personal information only for the purposes for which it was collected and in accordance with this Policy. We review our data collection, storage and processing practices to ensure that we only collect, store and process the personal information needed to provide or improve our services. We take reasonable steps to ensure that the personal information we process is accurate, complete, and current, but we depend on our users and partners to update or correct personal information whenever necessary

## Enforcement

ADZILLA regularly reviews its compliance with this Policy. Please feel free to direct any questions or concerns regarding this Policy or ADZILLA's treatment of personal information by contacting us through by email at privacy@ADZILLA.com or by writing to us at Privacy c/o ADZILLA Inc., 1140 West Pender Street, Suite 840, Vancouver, BC, Canada V6E 4G1. When we receive formal written complaints at this address, it is ADZILLA's policy to contact the complaining user regarding his or her concerns. We will cooperate with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that cannot be resolved between ADZILLA and an individual.

## Changes to this Policy

Please note that this Privacy Policy may change from time to time  We will not reduce your rights under this Policy without your explicit consent, and we expect such changes will be minor. Regardless, we will post any Policy changes on this page and, if the changes are significant, we will provide a more prominent notice Each version of this Policy will be identified at the top of the page by its effective date.

If you have any additional questions or concerns about this Policy, please feel free to contact us any time by email at privacy@ADZILLA.com or by writing to us at Privacy c/o ADZILLA Inc., 1140 West Pender Street, Suite 840, Vancouver, BC, Canada V6B 4G1.

DM_VAN/260207-00001/8351380.2 ver 0                              Page 21 of 22

DM_VAN/260207-00001/8351380.2 ver 3

Page 22 of 22

IN WITNESS WHEREOF the parties thereto have executed this Agreement, through their respective officers, duly authorized for such purpose, as they so declare and represent, as of the dates indicated below.

**ADZILLA INC.**

By - Print Name: _Jon Wrobbder_

Signature: _____

Title of Company's Representative: _VP-North American Networking_

Date: _8/30/2006_

Telephone: _604-628-4368_

Fax: _604-628-4351_

**CORETEL**

By - Print Name: _BRET MENO_

Signature: _____

Title of Company's Representative: _PRESIDENT_

Date: _8/30/06_

Telephone: _222-477-5211_

Fax: _410-216-9167_